## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## ABILENE DIVISION

| | | |
|---|---|---|
| MARIA CONCEPCION VALENZUELA CERVANTEZ, individually and as representative of the Estate of RUBEN ARTURO VALENZUELA | § § § | |
| | § | |
| vs. | § | |
| | § | |
| Bryan Collier, Bobby Lumpkin, Miguel Martinez, David Blackwell, Jody Hefner, Sergio Perez, Cris Love, Marisol Gutierrez, Cynthia Jumper, Denise De Shields, Will Rodriguez, Darrell Frith, Bob Harp, Manuel Enriquez, Jr., Gregory Bostic, Valdez, Greg McGuire, Sandra Castillo, Christine Heady, Herbierto Oronoz, Susan Boedeker, Nizam Peerwani, Susan Roe, Ken Paxton; all in their individual and official capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, TEXAS BOARD OF CRIMINAL JUSTICE, TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER. | § § § § § § § § § § § § § § § § § § | CIVIL NO. 1: 22-CV-00150 |

## PLAINTIFF'S FIRST AMENDED OMPLAINT

COMES NOW Plaintiff, Maria Valenzuela Cervantez individually, and as the heir and representative of the Estate of Ruben A. Valenzuela (formerly Texas Department of Criminal Justice inmate number 1785292), by and through the undersigned attorney, and brings this lawsuit against Defendants because they caused the needless death of Ruben A. Valenzuela while he was incarcerated and under their direct control at the Texas Department of Criminal Justice "TDCJ" Daniel Webster Wallace Unit in Colorado City, Texas.

**Statement of Claims**

1.      Plaintiff Maria Valenzuela individually, and as the heir and representative of the Estate of Ruben A. Valenzuela (formerly Inmate Number 01785292) brings this civil action for compensatory and punitive damages against Defendants Bryan Collier, Bobby Lumpkin, Miguel Martinez, David Blackwell, Jody Hefner, Sergio Perez, Cris Love, Marisol Gutierrez, Cynthia Jumper, Denise De Shields, Will Rodriguez, Darrell Frith, Bob Harp, Manuel Enriquez, Jr., Gregory Bostic, Valdez, Greg McGuire, Sandra Castillo, Christine Heady, Herbierto Oronoz, Susan Boedeker, Nizam Peerwani, Susan Roe, Ken Paxton, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, TEXAS BOARD OF CRIMINAL JUSTICE, and TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER in each of `their individual and official capacities, for violating his civil and statutory rights under the Eighth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. 12132, 42 U.S.C. 12101, 29 U.S.C. 794, and various Texas state statutes.

**Jurisdiction**

2.      This Court has federal jurisdiction pursuant to 28 U.S.C. 1331 (federal question), 1343 (civil rights), 42 U.S.C. 1983 and 1988, and the Eighth and Fourteenth Amendments to the United States Constitution. This Court has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a).

**Venue**

3.      Venue is proper in this Court, pursuant to 28 U.S.C. 1391(b)(1), as at least one Defendant, Texas Tech University, is based, and operates, in the district and division, and all Defendants reside in this state.

## Parties

### Plaintiffs

4.      Plaintiff Maria Concepcion Valenzuela Cervantez is the mother and sole surviving heir of Ruben Arturo Valenzuela. She sues in her individual capacity and as the sole heir-at-law to Ruben Arturo Valenzuela's estate and as a statutory beneficiary under the Texas Wrongful Death Act. Mr. Valenzuela died intestate, and there were no probate proceedings arising from his death, as none were necessary. She is a resident of El Paso County, Texas.

### Executive Defendants

5.      Each of these Defendants is a TDCJ executive officer, and they are collectively referred to as the "Executive Defendants," and acted as policy makers for the governmental units, and the policies and practices each promulgated and or failed to implement and this was the moving force behind the constitutional violations against Ruben.

6.      Bryan Collier is the Executive Director of TDCJ. As such, Collier is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At  all relevant times, Collier was acting under color of law and as the agent, and, as a matter of law, an official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Collier is a resident of Huntsville, Texas, in Walker County. He can be served process at 861-B, IH-45 North, Huntsville, TX 77320 or wherever he may be found.

7.      Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division. As such, Lumpkin is responsible for providing safe and appropriate confinement, supervision, rehabilitation and reintegration of adult felons, and to effectively manage or administer correctional facilities based on constitutional and statutory standards. Director Lumpkin is

obligated to improve public safety by providing effective interventions through a safe, secure, and positive environment empowering individuals to achieve life-long success. Director is also obligated to protect the interests of the state of Texas when contracting with outside vendors and representatives through effective management, monitoring, and on-going communication between the TDCJ and its contracted representatives. At all relevant times, Lumpkin was acting under color of law and as the agent, and, as a matter of law, an official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Lumpkin is a resident of Huntsville, Texas, in Walker County. He can be served process at 861-B, IH-45 North, Huntsville, TX 77320 or wherever he may be found.

8.      Miguel Martinez is the Deputy Director of the Correctional Institutions Division for TDCJ Region V (5), wherein sits the Wallace Unit. The Correctional Institutions Divisions is responsible for the confinement of adult felony and state jail felony inmates who are sentenced to incarceration in a secure facility. The CID oversees state prisons, psychiatric facilities, Developmentally Disabled Offender Program, medical facilities, and substance abuse felony punishment facilities (SAFPF). At all relevant times, Martinez was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Martinez is a resident of Texas. He can be served process at 861-B, IH-45 North, Huntsville, TX 77320 or wherever he may be found.

9.      David Blackwell is the Regional Director for TDCJ's Region V. As Regional Director Blackwell's position involves establishing goals and objectives; developing guidelines, procedures, rules, and regulations; developing schedules, priorities, and standards for achieving established goals; coordinating and evaluating program activities; developing and evaluating budget requests; monitoring budget expenditures; and planning, assigning, and supervising the work of others. At all relevant times, Blackwell was acting under color of law and as the agent,

and, as a matter of law, an official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Blackwell is a resident of Texas. He can be served process at the Region IV Director's Office 965 Ofstie Street, Beeville, TX 78102-8986 or wherever he may be found.

10.    Jody Hefner was the Warden at the Wallace Unit when Mr. Valenzuela died, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TDCJ, Hefner acted to conceal the unconstitutional conduct against Mr. Valenzuela. As warden, Hefner was obligated to perform advanced managerial correctional and criminal justice administration work at the Wallace unit. Warden Hefner's duties involved managing and overseeing correctional facilities; administering policies and procedures; directing security, housing, and facility operations; and supervising the work of others. Wardens work under minimal supervision with considerable latitude for the use of initiative and independent judgment. TDCJ wardens are obligated to ensure that policies, procedures, rules, and regulations are enforced. Further, TDCJ wardens direct the preparation and documentation of work assignments, classification committee, rehabilitative records, and reports on inmates, and are policymakers for their units. Hefner is sued in his individual capacity for punitive and compensatory damages. He can be served at 1675 South FM 3525, Colorado City, TX 79512or wherever he may be found.

11.    Sergio Perez is currently the Warden at the Wallace Unit, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served process at 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

12.    Cris Love was head of the Office of Inspector General ("OIG") for TDCJ when Mr. Valenzuela was killed, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TBCJ. As OIG, Love was obligated to

investigate to ensure enforcement of various laws and regulations, as well as monitor investigative and audit techniques, and regulations in order to make recommendations of appropriate action to the TBCJ. Also he is responsible for all other legitimate matters that were also investigated as requested or directed by the Board or by the laws of the State of Texas. Love is sued in his individual capacity for punitive and compensatory damages. He can be served at 1012 Veterans Memorial Pkwy, Huntsville, TX 77320 or wherever he may be found.

13.     Marisol Gutierrez was the reporter from the Office of Inspector General ("OIG") for TDCJ when Mr. Valenzuela was killed, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TBCJ. As an OIG reporter, Gutierrez was obligated to investigate to ensure enforcement of various laws and regulations, as well as monitor investigative and audit techniques, and regulations in order to make recommendations of appropriate action to the TBCJ. Also she is responsible for investigating all other matters that were requested by the Board or by the laws of the State of Texas. Gutierrez is sued in her individual capacity for punitive and compensatory damages. She can be served at 1012 Veterans Memorial Pkwy, Huntsville, TX 77320 or wherever he may be found.

14.     Dr. Cynthia Jumper was the Vice President of Health Policy and Special Health Initiatives for Texas Tech University Health Science Center ("TTUHSC") at the time Ruben was killed, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TTUHSC. As such, she is responsible for ensuring that TTUHSC staff are properly trained and educated in effectively helping inmates experiencing a mental health crisis. She is also responsible for training and educating medical staff on how to properly identify and report correctional staff illegal use of excessive force. Jumper is sued in her individual capacity for punitive and compensatory damages. She can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever she may be

found.

15.    Dr. Denise DeShields was the Executive Medical Director of Managed Care for Texas Tech University Health Science Center ("TTUHSC") at the time Ruben was killed, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TTUHSC. As such, she is responsible for ensuring that TTUHSC staff are properly trained and educated in effectively helping inmates experiencing a mental health crisis. She is also responsible for training and educating medical staff on how to properly identify and report correctional staff illegal use of excessive force. DeShields is sued in her individual capacity for punitive and compensatory damages. She can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever she may be found.

16.    Will Rodriguez was the Executive Director for Texas Tech University Health Science Center ("TTUHSC") at the time Ruben was killed, and at all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the TTUHSC. As such, he is responsible for ensuring that TTUHSC staff are properly trained and educated in effectively helping inmates experiencing a mental health crisis. He is also responsible for training and educating medical staff on how to properly identify and report correctional staff illegal use of excessive force. Rodriguez is sued in his individual capacity for punitive and compensatory damages. He can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever she may be found.

17.    Dr. Peerwani was the Tarrant County Chief Medical Examiner at the time Ruben was killed and staff under his supervision conducted the preliminary and final autopsy of Ruben. At all relevant times was acting under color of law and as the agent, and, as a matter of law, an official representative of the Tarrant County, Texas Medical Examiner's Office. As Chief Medical Examiner, Peerwani was responsible for ensuring that his staff members are properly trained to

conduct honest and ethical evaluations to accurately ascertain the true cause of death. Peerwani is sued in his individual capacity for punitive and compensatory damages. He can be served at 200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919 or wherever she may be found.

18.     Ken Paxton was the Attorney General of Texas at the time Ruben was murdered. At all relevant times he was acting under color of law and as the agent, and, as a matter of law, an official representative of the Texas Attorney General's Office. As such, he is responsible for ensuring **enforcement of federal laws**, provides legal counsel in federal cases, interpreting the laws that govern executive departments, heading federal jails and penal institutions, and examining alleged violations of federal laws. Paxton is sued in his individual capacity for punitive and compensatory damages. He can be served at Texas 300 W. 15th Street, Austin, TX 78701 or wherever he may be found.

**Additional Defendants**

19.     Defendant Darrel Frith was a captain at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

20.     Defendant McGuire was a guard at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

21.     Defendant Manuel Enriquez Jr. was a guard at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official

representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

22.    Defendant Harp was a guard at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

23.    Defendant Bastic was a guard at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

24.    Defendant Valdez was a guard at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. She is sued in his individual capacity for punitive and compensatory damages. He can be served at the Daniel Webster Wallace Unit, 1675 South FM 3525, Colorado City, TX 79512 or wherever he may be found.

25.    Sandra Castillo was a Licensed Vocational Nurse at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ and TTUHSC. She is sued in her individual capacity for punitive and compensatory damages. She can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever she may be found.

26.    Christine Heady was an Advanced Practice Registered Nurse at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ and TTUHSC. She is sued in her individual capacity for punitive and compensatory damages. He can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever he may be found. Herbierto Oronoz was a Qualified Mental Health Professional and Licensed Professional Counselor at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ and TTUHSC. He  is sued in his individual capacity for punitive and compensatory damages. He can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever he may be found.

27.    LVN Susan Boedeker was a Licensed Vocational Nurse at the Wallace Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ and TTUHSC. She is sued in her individual capacity for punitive and compensatory damages. He can be served at Texas Tech University Health Sciences Center - 3601 4th Street, Lubbock, TX 79430 or wherever he may be found.

28.    The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Wallace Unit, a public facility with programs and services for which the deceased and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. It can be served process by serving Bryan Collier, its executive director, at 861-B, IH-45 North, Huntsville, TX 77320. He can be served wherever he may be found.

29.    The Texas Board of Criminal Justice is an agency of the State of Texas responsible for oversight of TDCJ's confinement and rehabilitation of the state's convicted felons. TBCJ's

high-ranking policymakers reside in Austin, Texas. At all relevant times, it conducted the OIG investigation at the Wallace Unit, a public facility with programs and services for which the deceased and other prisoners with disabilities were otherwise qualified. TBCJ is a recipient of federal funds. TBCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. It can be served process by serving Chairman Patrick L. O'Daniel, at 209 West 14th Street, Suite 500, Austin, TX 78701. He can be served wherever he may be found.

30.    Texas Tech University Health Science Center, located in Lubbock, is a component of the Texas Tech University system. Texas Tech University Health Science Center's high-ranking policymakers, including Dr. Denise DeShields reside and work in Lubbock. Through its Correctional Managed Care Program, TTU partners with TDCJ to provide health care to thousands of TDCJ prisoners, including prisoners at the Wallace Unit.  TTU is a recipient of federal funds, and is sued for declaratory, and compensatory relief under federal law. It can be served process by serving its president, Will Rodriguez, at 3601 4th Street, Lubbock, TX 79430.

31.    Susan Roe, M.D., performed the complete autopsy and at all relevant times was acting under color of law and as the agent, and, as a matter of law, the official representative of the Tarrant County Medical Examiner's District. She is sued in his individual capacity for punitive and compensatory damages. She can be served at 200 Feliks Gwozdz Place, Fort Worth, Texas 76104-4919 or wherever she may be found.

**Factual Allegations**

32.    Ruben Arturo Valenzuela was first taken into Texas Department of Criminal Justice custody May 3, 2012. His assigned TDCJ number was #01785292.

33.    For over a year, Ruben had been at the Daniel Webster Wallace Unit located at 1675 South FM 3525; Colorado City, Texas 79512. In the 6 months preceding his death, Ruben

had been cellmates with inmate Joseph Chipps #01855968. Their housing assignment was D-Wing Cell 119.

34.     At the time of his death, Mr. Valenzuela had served over 8 years 1 month and 10 days of a 12-year sentence. The parole board considered and agreed to grant parole to Mr. Valenzuela before his death.

35.     On January 5th Ruben was sucker punched and forced to defend himself. This fight only lasted a few seconds, and neither person sustained any major injuries. That same day Ruben was checked and cleared by medical and mental health staff, then released back to the general population. He was returned to the same block but placed in a different cell, 103. According to the reports, "[Ruben] only suffered from superficial lacerations to his head and neck with no visible bleeding."

36.     Further, Ruben also denied any homicidal or suicidal ideations, and staff concurred that he was not a threat to himself or others. At this point, Ruben was not on any psychiatric medications and did not have any significant medical or psychiatric history while in TDCJ. In the disposition section, Williams recommended or ordered that Ruben be released to security for an offender protection investigation ("OPI").

37.     After returning to general population on or about January 6th or 7th, Ruben fought with former cellmate Chipps in their former cell 119. The fight was based on Ruben's belief that Chipps had informed the correctional officer that Ruben had a fight on the 5th. As a result of the fight, Chipps suffered a busted nose and lip, and Ruben sustained minor bruises and a bloody nose. The only witnesses to the Chipps fight were Ruben's friends who accompanied him to act as lookouts.

38.     From there, Ruben returns to his new cell and begins to drink a large amount of alcohol. While conducting their rounds, officers Alabusu and Bagimbe found Ruben drunk in his

cell. The two officers then briefly carried Ruben away and returned him to cell 103.

39.     On or about January 8th, Chipps approached Ruben's cell and spoke with him through the door. They again exchanged accusations of cooperating with correctional staff. When Ruben's cell door was opened, staff escorted Ruben to restrictive housing in the E Wing.

40.     In the process of being escorted to the E wing, correctional staff walked Ruben between the Administration Building and the E Wing, a known "blind spot", and unnecessarily beat him while he was handcuffed. This is a notorious practice used by Guards to sadistically punish inmates on their way to "the hole" for a rules violation.

41.     7:51 am January 8, 2021, LVN Jennifer Aguilar electronically signed a Correctional Managed Health Care Nursing Protocol for Psychiatric Symptoms. According to the note: Ruben reported having homicidal ideations and admitted to alcohol use.  Vitals  were taken and noted as within normal limits. Records list Phenytoin Sod 100 MG ER Capsule, also known as Dilantin, as his only current medication. Aguilar describes Ruben as quiet, cooperative, able to speak in full clear sentences, and oriented to his person and place. Physically, his appearance was described as disheveled and unkempt. The "Treatment Plan" section of the note reads, "refer immediately to on-call mental health provider. Threat to self or others." The "Disposition" section of the note reads, "return to housing, crisis management notified. Spoke with Martinez, RN. Inmate to be placed on the waiting list. No beds available. Suicide blanket and johnnies only Leslie, NP/J. Aguilar LVN. Security notified to provide constant direct observation until bed becomes available. Suicide blanket issued. Inmate released to security in stable condition."

42.     At 9:56 am January 8, 2021, Herbierto Oronoz, a designated qualified mental health professional ("QMHP") and Licensed Professional Counselor ("LPC") performed an assessment. Ruben explained that he was put in administrative segregation because of a fight, and placed under an offender protection investigation because staff was making sure he was safe. He reassured

Oronoz that he was "alright." The " Initial Assessment

 Questions" section of the report stated that Ruben had a history of suicidal behavior and psychiatric treatment; he was not currently receiving mental health treatment. Oronoz reported that Ruben **did not show signs of abuse or trauma**. Oronoz reported that Ruben did not exhibit any signs of mental illness requiring professional help. Oronoz also reported that Ruben was not a risk to himself or others. In closing, he  ordered  a follow-up via telehealth after 30 days if Ruben was still in restrictive housing, on February 6, 2021.

43.      At 12:48 pm January 8, 2021, LVN Sandra Castillo and APRN Christine Heady completed a Nursing Protocol for Wounds. The note falsely states that Ruben was injured at midnight on January 8, 2021, resulting from an altercation with another offender. His wounds were described as contusions and abrasions were warm and red. Also, Ruben was started on acetaminophen 325mg (Tylenol) at that time. The disposition noted was, "REFER TO MENTAL HEALTH." As a precursor to future cover-ups by Castillo, she failed to document Captain Frith's beating of Ruben the night as a contributing factor to Ruben's then-present injuries.

44.      On January 9th, 10th, and 11th Ruben began experiencing a serious mental health emergency as evidenced by his arguing and yelling at imaginary people in his one-man cell, and his repeated cries for help from staff. As part of their rounds, various care providers observed Ruben and documented that no significant psychological or physical health findings were of concern at that time.

**THE DAY RUBEN WAS KILLED**

45.      January 13, 2021, was a torturous and fatal day for Ruben Arturo Valenzuela for the reasons detailed below.

46.      In the early morning hours, Ruben began crying, loudly arguing with God, and begging for help. In a sadistic attempt to quiet him, Captain Frith repeatedly entered Ruben's cell

and beat him uncontestedly.

47.     At 5:45 am on January 13th, LVN Castillo responded to the spectacle of Ruben being beaten by Frith and submitted a handwritten late entry Clinic Note. The Note detailed that first Ruben refused seizure medication because he had not had a seizure in a long time. Then, as per the documentation, Ruben agreed to take the seizure medication. Castillo states that she explained to Ruben that levels in his body were within normal range, but once levels in his body decreased, the risk of seizure would increase.

48.     At 1:41 pm on January 13th, Ruben was placed in administrative segregation awaiting a mental health evaluation for homicidal thoughts and a bed placement in Crisis Management. He was reportedly seen naked, putting his head in the toilet, smearing  feces in the cell, yelling at people who were not there, yelling that he wanted to die, and not responding to officer commands. At this time it was undoubtedly clear that Ruben was experiencing a severe mental health crisis and delusion. In response to this mental health crisis, the 5-man team was "suited up", chemical agents were used, and an excessively vicious attack by all 5 officers was waged on Ruben. He was kicked, punched, slammed by the head, and illegally choked by all 5 officers far beyond any reasonable necessity. The team consisted of Officers Darrel Frith, McGuire, Bostic, Harp, and Enriquez; all of whom were notorious for abusing their authority to beat inmates. Officer Valdez operated the camera and intentionally pointed it at the ground to obstruct later legal action by the Valenzuela family.

49.     At 1:52 pm on January 13th, Crisis Management called, and notified Wallace unit staff that Ruben was seventh on the waiting list for bed placement. Nurses requested an order to remove the suicide blanket because it was soiled with feces.

50.     At 2:15 pm on January 13th, LVN's Castillo and Boedeker documented that Ruben refused to follow officer commands to stop having a mental health crisis and that officers sprayed

him with chemical agents again.

51.     Despite having been sprayed twice, Ruben remained in a crisis state and continued putting his head in the toilet & yelling. Castillo and Boedeker attempted to cover up the excessive force and torture by **reporting that Ruben had no visible injuries**.

52.     At 2:20 pm on January 13th, staff noted that Ruben was sprayed with chemical agents a third time. According to reports, the 5-man extraction team entered his cell as Ruben screamed and hollered. He was subdued and handcuffed by the ankles and wrists. In conducting this extraction, officers used excessive force and severely beat Ruben while he was in handcuffs. He was taken to shower to rinse off the chemical agents. Medical staff reported that he sat on the floor while he yelled for water. LVN's Castillo and Boedeker falsified medical reports to hide the officer's excessive force, by stating that aside from a bloody nose he had no visible injuries from the 5-man team cell extraction.

53.     Also, Doctor Baker called for orders to sedate if needed, but the sedatives were never administered.

54.     At 3:30 pm on January 13th, Dr. Baker ordered the following medications: a haloperidol injection used to treat mental health and mood disorders; a diphenhydramine injection of antihistamine to treat allergies, and a lorazepam injection to treat seizure disorders.

55.     As Ruben came closer to his death he was increasingly exhausted, delusional, and suffering from the effects of repeated blunt force trauma to the head, being gassed, and being strangled.

56.     At 11:33 pm on January 13th, RN Cogburn submitted a late entry Nursing Chart Review marked 8:05pm of the same day. Therein, she states that "security reports" Ruben was witnessed in a syncope episode and he fell face forward into the concrete floor. Further, she noted that according to "security reports" Ruben had seizure-like activity before going unconscious. ICS

was initiated and an EMS was notified. When EMS arrived at 8:30 pm, Ruben had no treatable heart rhythm.

57.     Throughout the day various correctional officers threatened to run the 5-man team, gas and beat Ruben more if he did not cease having his mental breakdown. Ruben only responded by begging the officers to leave him alone and telling them that he would not cause any problems.

58.     As the Lieutenant on duty was ordering Ruben's cell door to be opened so he could continue the physical torture, Officer Alfred intervened and began civilly and respectably talking with Ruben. Ruben responded positively by asking several officers to join him while he prayed for everyone in the block and for Jesus Christ to bring justice to the world.

59.     Immediately after, Ruben experienced an early posttraumatic seizure as he vomited blood and collapsed face-first on the concrete.

60.     At 9:45 pm on January 13th, Ruben was pronounced dead by Judge Williams in PHD Cell 3. His last words were, "God Bless Us All."

**THE COVER-UP**

61.     After Ruben's death, a representative from the Office of the Inspector General ("OIG"), came to the area where Ruben was killed and collected statements from officers, medical staff, and inmates. Despite the consensus from inmates that the guards illegally used excessive force, the OIG took no further actions against the responsible parties and assisted in covering up TDCJ and TTUHSC's wrongdoing.

62.     Tarrant County Medical Examiner's office through both the preliminary and final autopsy reports purposefully attempted to cover up and pass off Ruben's death as a result of natural causes, and not excessive force to the head and neck area; as was obvious based on his body and inmate reports. This misrepresentation was done systematically and intentionally to cover up the wrongdoings of TDCJ staff.

63.    Ken Paxton and the Attorney General's Office of Texas also attempted to cover up Ruben's true cause of death by claiming that he died from exercising in his cell and not from the brutal and lethal excessive force exacted by various Wallace unit officers and assisted by TTUHSC staff.

64.    Before this incident, Ruben's former cellmate and friend, Joseph Ben-David Chipps had been incarcerated at the Wallace Unit for three years. During that time, he had not experienced any retaliation from correctional staff, until four days after Ruben's passing when he was served with a disciplinary case for his fight with Ruben on or about January 7th. Chipps immediately filed a Step 1 Grievance to contest it because he was acting in self-defense after an intoxicated Ruben entered his cell and challenged Chipps to a fight. As a means of ensuring Chipps could not contest the disciplinary case and thereby denying his access to courts, TDCJ staff at Wallace never answered and returned the Step

1 grievance, which is the prerequisite to filing the Step 2 grievance and thereby exhausting the administrative grievance process.

**Count I**
**Federal Civil Rights Claim Under 42 U.S.C. 1983 for Violation of the Eighth and Fourteenth Amendments**

65.    The acts and conduct of the defendant officers Frith, McGuire, Bostic, Harp, Enriquez, and Valdez constituted an <u>illegal and unconstitutional use of force</u> under the Eighth Amendment thereby creating a cruel and unusual confinement. The manner in which these officers repeatedly beat and choked Ruben Arturo Valenzuela was an unnecessary and wanton infliction of pain which led to his untimely death. These officers acted maliciously, sadistically, and in bad faith. These six defendants were notorious and feared by inmates because of their reputation for using excessive force to beat inmates to death or as close as possible to it.

66.    Plaintiff claims damages for the wrongful death of Ruben Arturo Valenzuela and

for his loss of income, services, companionship, and for funeral and burial expenses under 42 U.S.C. 1983.

67.     Jody Hefner, Sergio Perez, Brad Livingston, Bobby Lumpkin, Miguel Martinez, and David Blackwell caused the constitutional violations by reason of their practice and custom, with deliberate indifference, of failing to properly train, supervise and discipline correctional officers, including the defendant officers, in the proper use of force. The defendants named in this paragraph have also failed, with deliberate indifference, to properly train, supervise and discipline correctional officers in situations involving emotionally disturbed persons and in the proper means of detaining or protecting such persons from harming themselves or others.

### Count II
### Federal Civil Rights Violations Under
### 42 U.S.C. 12132, 42 U.S.C. 12101, and 29 U.S.C. 794

68.     All of the Defendants discriminated against plaintiff's decedent by reason of his mental health disability, denying him the benefits of the services, programs and activities to which he was entitled as a person with a mental health disability, including but not limited to the right to be free of discriminatory or disparate treatment by virtue of his mental disability, and to due process of the law. As a result, plaintiff's decedent suffered harm in violation of his rights under the laws and Constitution of the United States, 42 U.S.C. 12132, 42 U.S.C. 12101, and 29 U.S.C. 794.

69.     Defendants failed to comply with the mandates of 42 U.S.C. 12132, 42 U.S.C. 12101, and 29 U.S.C. 794 in the following areas:

a.     The failure to properly train, supervise and discipline corrections officers regarding crisis intervention technique for individuals who exhibit the signs and symptom of mental disabilities;

      b.     The failure to provide adequate training and resources for crisis intervention teams of corrections officers and others to respond to emergencies involving persons with mental health disabilities;

      c.     The failure of correctional officers to follow established policies, procedures, directives and instructions regarding crisis intervention techniques for individuals who exhibit the signs and symptoms of mental health disabilities.

70.     By these actions, defendants have deprived plaintiff's descendants of rights secured by the United States Constitution, 42 U.S.C. 12132, 42 U.S.C. 12101, and 29 U.S.C. 794.

**Count III**
**Federal Civil Rights Claim Under 42 U.S.C. 1983 for Violation of the First Amendment**

71.     Medical Professionals Herbierto Oronoz, Sandra Castillo, Susan Boedeker, Susan Roe, and Nizam Peerwani conspired to cover up the true origin of the injuries sustained by intentionally not reporting the origin, true cause, and extent of the injuries that caused Ruben's death.

72.     OIG Cris Love also conspired to cover up the true origin of the injuries sustained by intentionally not reporting the origin, extent of the injuries, and officer involvement in Ruben's killing.

73.     Oronoz, Castillo, Boedeker, Roe, Peerwani, and Love impeded Ruben and his heirs' access to the courts by concealing information and falsifying their findings.

74.     Ken Paxton and the Attorney General's Office of Texas also attempted to cover up Ruben's true cause of death by claiming that he died from exercising in his cell and not from the brutal and lethal excessive force exacted by various Wallace unit officers with the help of TTUHSC staff's fraudulent documentation.

75.     Defendants omitted material information and statements in records in an effort to conceal the unconstitutional actions by officers Darrel Frith, McGuire, Bostic, Harp, Enriquez, and Valdez.

76.     In addition, executive and additional defendants have conspired with each other to withhold information by ordering the denial and denying request for information relating to the treatment of inmates while in custody, namely those who have died while in custody, and seeking an attorney general's opinion alleging an ongoing investigation. TDCJ officials have a practice of withholding reports of those who have died in the TDCJ custody in an effort to delay, deny and impede access to the truth and access to courts to the surviving next of kin. This practice only occurs when the decedent dies under suspicious conditions in custody, not for natural causes where there is no alleged constitutional violation.

**Count IV**
**State Law Claims**

77.     The conduct of the defendants was willful, reckless, and intentional. In totality, these actions constituted assault, battery, survival, wrongful death under state law TEX. CIV. PRAC. & REM. CODE 71.001 to 71.003 (2021), and this court has supplemental jurisdiction to hear and adjudicate these claims.

78.     Defendant Darrell Frith struck Ruben repeatedly throughout the night and early morning of January 7th and 8th, causing him to suffer unnecessary pain, and suffering. Frith was not acting in self-defense or defense of others. Frith was acting with malice against Ruben for complaining about his serious medical needs.

79.     Ruben Valenzuela filed no action during his lifetime, but under the laws of the State of Texas the action for pain and suffering survives and may be asserted by his Estate. TEX. CIV. PRAC. & REM. CODE 71.004.

**Count V**
**Conditions of Confinement**

80.     Telford Unit has a long history of allowing the blind spots from the prison inmate cells to the punitive unit "the hole," formally known as administrative segregation, to exist after it has been well aware that many inmates needed infirmary care after taking the trip and passing the blind spot area.

81.     The warden has a duty to ensure that inmates receive adequate food, clothing, shelter, and medical care, and to reasonable measures to guarantee the safety of the inmates. Ruben was stripped of virtually every means of self-protection and foreclosed his access to outside aid, the wardens are not free to let the state of nature take its course but that is exactly what occurred in this case after he was taken to the blind spot this is a result of the deliberate indifference to inmates constitutional rights.

**Count VI**
**Failure to Discipline, Supervise, or Train**

82.     The wardens Hefner and Perez in this case had a duty to train their officers but failed to train his officers to monitor, and

83.     The wardens Hefner and Perez in this case had a duty to supervise their officers but failed to supervise their officers to ensure there is no violation of civil rights and the inmates in his custody are not treated with deliberate indifference to their medical needs.

84.     The wardens Hefner and Perez in this case had a duty to discipline their officers but failed to discipline officers who have engaged in conduct involving unreasonable use of force, namely while escorting inmates to the hole to the known blind spot. There is a policy against documenting injuries of inmates with photographs after an inmate complains of unreasonable use of force.

## INJUNCTIVE RELIEF

85.    Implementation of a policy that requires medical staff to take pictures after any and all use of force by correctional staff; and those pictures be stored in an inmate's file permanently in conjunction with written documentation.

86.    Immediate placement of cameras along all walkways between the Administration Building and Administrative Segregation housing on the Wallace Unit to end the historic and current illegal custom of correctional staff wherein they escort inmates to "blind spot" and beat them with impunity.

## RELIEF

Plaintiff prays that he has a judgment against Defendants for actual damages shown and proven at trial, for prejudgment, post-judgment interest, for costs of court, and all other relief, legal and equitable, to which he is entitled.

Wherefore, Plaintiff requests this Court to Order:

1.    Compensatory damages;

2.    Past pain and suffering

3.    Punitive damages against the individual defendants;

4.    Attorney's fees and costs pursuant to 42 USC Sec.1988;

5.    All other appropriate relief.

Plaintiff hereby demands a jury trial.

Filed on November 2, 2022.

Respectfully submitted,

*/s/Terry Henderson Peden*
Terry H. Peden
ATTORNEY-IN- CHARGE
Texas State Bar Number 24123963
PO Box 1410
Houston, TX 77251
334.544.9471

*Pro Hac Vice Motion Pending*

*/s/ U.A. Lewis*
U.A. Lewis
Texas State Bar No. 24076511
THE LEWIS LAW GROUP
P.O. Box 27353
Houston, TX 77227
713.570.6555 - T
713.581.1017 - F
myattorneyatlaw@gmail.com

*Pro Hac Vice Motion Pending*

/s/Tanja K. Martini
Tanja K. Martini
SBN 24032581
THE MARTINI LAW FIRM, PC
10440 N. Central Expy., Ste. 1240
Dallas, Texas 75231
214.753.4757 – T
888.248.1734 – F
tanja@themartinilawfirm.com

**CERTIFICATE OF SERVICE**

On November 2, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Tanja K. Martini
Tanja K. Martini