UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

MARIA CONCEPCION VALENZUELA
CERVANTEZ, individually and as
representative of the ESTATE OF RUBEN
ARTURO VALENZUELA,

      Plaintiff,

v.

CRIS LOVE, et al.,

      Defendants.

No. 1:22-CV-150-H

## MEMORANDUM OPINION AND ORDER

The allegations in this case are indisputably disturbing. The plaintiff, Maria Valenzuela Cervantez, asserts that five correctional officers responded to her son Ruben Valenzuela's mental-health crisis by beating him severely, resulting in his death. However, the claims brought here expand far beyond than the alleged actions of those officers.

Before the Court are three motions seeking dismissal of claims raised against 12 of the 17 defendants. Dkt. Nos. 55; 56; 73. These motions do not concern the claims against the five officers, but they address instead various claims against a variety of other government officials and entities based entirely on unsupported conclusory statements. The Court grants the motions and dismisses with prejudice the claims against Sandra Castillo, Susan Boedeker, Nizam Peerwani, Jose Valdez, Cris Love, Ken Paxton, Cynthia Jumper, Denise DeShields, Jody Hefner, the Texas Department of Criminal Justice (TDCJ), the Texas Board of Criminal Justice (TBCJ), and the Texas Tech University Health Sciences Center (TTUHSC). The alleged egregious actions of certain officers cannot automatically subject any official tangentially related to them or the prison to liability.

1.      **Factual and Procedural Background**[1]

    A.      **Factual Allegations**

Valenzuela[2] was an inmate serving a twelve-year sentence in the TDCJ and was housed in the Wallace Unit in Colorado City, Texas.  Dkt. No. 50 ¶¶ 31–33.  On January 5, 2021, his then-cellmate, Joseph Chipps, "sucker punched" Valenzuela, causing "superficial lacerations to his head and neck with no visible bleeding."  *Id.* ¶¶ 32, 34, 103.[3]  Following this incident, Valenzuela was checked by medical and mental-health staff and placed in a new cell.  *Id.* ¶ 34.  At this time, he "was not on any psychiatric medications and did not have any significant medical or psychiatric history while in TDCJ."  *Id.* ¶ 35.  A day or two later, Valenzuela fought Chipps because he "belie[ved] that Chipps had informed the correctional officer" of the previous fight.  *Id.* ¶ 36.  Both men sustained minor injuries from this second fight, and Valenzuela returned to his new cell where he drank a lot of alcohol.  *Id.* ¶¶ 36–37.  Chipps approached Valenzuela's new cell a day or two later, and "[t]hey again exchanged accusations of cooperating with correctional staff."  *Id.* ¶ 38.  After that third heated interaction between Chipps and Valenzuela, correctional staff decided to move Valenzuela to restrictive housing.  *Id.*  While escorting him to the restrictive housing wing, unspecified officers[4] allegedly stopped in a blind spot between wings and "beat him while he

---

[1] When considering a motion to dismiss, the Court "must accept as true the well-pled factual allegations in the complaint, and construe them in the light most favorable to the plaintiff." *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (cleaned up) (quoting *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

[2] For clarity, the Court refers to the plaintiff as "Cervantez" and the deceased as "Valenzuela."

[3] On page 14 of the second amended complaint, the paragraph numbers go from 34 to 103 to 35.  *See* Dkt. No. 50 ¶¶ 34–35.  This citation refers to paragraph 103 on page 14.

[4] It appears that Captain Darrell Frith might be one of the officers in question.  *See* Dkt. No. 50 ¶ 42 (discussing "Captain Frith's beating of [Valenzuela] the night [sic]" as a cause of injuries later that day).

was handcuffed," which "is a notorious practice used by [g]uards to sadistically punish inmates on their way to 'the hole' for a rules violation." *Id.* ¶ 39.

Once Valenzuela arrived in restrictive housing, he was visited by a health care provider who noted that he "reported having homicidal ideations and admitted to alcohol use" and recommended that he be "refer[red] immediately to [the] on-call mental health provider." *Id.* ¶ 40.  The provider's note further stated that no beds were available in mental-health housing, so Valenzuela was given a suicide-prevention blanket and clothing and placed on constant direct observation until a bed became available.  *Id.*  Two hours later, a qualified mental-health professional visited Valenzuela and reported no signs of concern.  *Id.* ¶ 41.  His report stated that Valenzuela "did not show signs of abuse or trauma" and "was not a risk to himself or others."  *Id.* (emphasis omitted).  The mental-health professional ordered a follow-up telehealth visit 30 days later if Valenzuela remained in restrictive housing.  *Id.*  Nurses Sandra Castillo and Christine Heady then "completed a Nursing Protocol for Wounds" for Valenzuela, reporting that he was injured by another inmate rather than by guards and noting warm and red contusions and abrasions.[5]  *Id.* ¶ 42.

Starting on January 9 and until his death on January 13, Valenzuela experienced a serious mental-health crisis.  *Id.* ¶¶ 43–59.  He started "yelling at imaginary people in his one-man cell" and calling to staff for help.  *Id.* ¶ 43.  Nevertheless, the unspecified care providers who visited him documented no significant health concerns.  *Id.*  In the early hours of January 13, Valenzuela "began crying, loudly arguing with God, and begging for help."  *Id.* ¶ 45.   To silence him, a prison official, Darrell Frith, allegedly entered his cell

---

[5] It is unclear whether these nurses actually visited or otherwise observed Valenzuela before filling out this report.  *See* Dkt. No. 50 ¶ 42; *see also id.* ¶ 43 (noting that "various care providers observed [Valenzuela]" without identifying any of those providers).

and beat him.  *Id.*  Nurse Castillo "responded to the spectacle of [Valenzuela] being beaten by Frith."  *Id.* ¶ 46.  In her clinic note written after visiting Valenzuela, she noted that she successfully persuaded him to take his seizure medication after he initially refused to do so.[6]  *Id.*

Later that day, Valenzuela "was placed in administrative segregation awaiting a mental health evaluation for homicidal thoughts and a bed placement in Crisis Management."[7]  *Id.* ¶ 47.  He continued to exhibit signs of a mental-health crisis: "[h]e was reportedly seen naked, putting his head in the toilet, smearing feces in the cell, yelling at people who were not there, yelling that he wanted to die, and not responding to officer commands."  *Id.*  In response, a five-man team, consisting of Frith, Greg McGuire, Greg Bastic, Joe Harp, and Manuel Enriquez, Jr., allegedly entered Valenzuela's cell, sprayed him with chemical agents, and then kicked, punched, choked, and slammed Valenzuela by the head.  *Id.*[8]  Another officer, Jose Valdez, operated the camera in Valenzuela's cell and "intentionally pointed it at the ground."[9]  Dkt. No. 50 ¶ 47.

About ten minutes after this alleged beating, Crisis Management contacted the Wallace Unit staff to inform them that Valenzuela was seventh on the waiting list for a bed

---

[6] Unlike many of the other reports, there is no allegation as to whether Castillo made any report regarding any alleged beating by Frith.  *See* Dkt. No. 50 ¶ 46.  Thus, there is no allegation that, at this time, Castillo made any false report as to Valenzuela's medical condition, its cause, or that he needed any medical assistance that she failed to provide.  *Id.*

[7] It is unclear whether Valenzuela was removed at some point from segregated housing between January 8 and 13, or if this was a continuation of his placement following the fights with Chipps and his report of homicidal ideation.  *See* Dkt No. 50 ¶¶ 38–40, 47.

[8] *See also* Dkt. No. 71 at 1 & n.1 (noting the correct spelling of the names of the officers at issue).

[9] It is unclear whether the plaintiff is alleging that Valdez was also physically in the cell operating a camera or was instead elsewhere monitoring and operating a camera placed in the cell.  Dkt. No. 50 ¶ 47.

placement.  *Id.* ¶ 48.  Nurses Castillo and Susan Boedeker then entered a report about Valenzuela, noting that he had refused to follow officer commands, had been sprayed with chemical agents for a second time, and had no visible injuries.  *Id.* ¶¶ 49–50.  Unspecified nurses also requested that Valenzuela's suicide blanket be removed because he had soiled it with feces.  *Id.* ¶ 48.  A few minutes later, Valenzuela was sprayed with chemical agents again, and the five-man team reentered his cell, handcuffed his wrists and ankles, and severely beat him.  *Id.* ¶ 51.  Officers then took Valenzuela to shower and rinse off the chemical agents.  *Id.*  Castillo and Boedeker again entered a medical report indicating that he had no visible injuries besides a bloody nose.[10]  *Id.*  About an hour after this second beating, a doctor ordered various medications for Valenzuela to address his mental-health condition.[11]  *Id.* ¶ 53.  The doctor also ordered sedatives to be administered on an as-needed basis, but the sedatives were not administered.  *Id.* ¶ 52.

For the remainder of the day, "various correctional officers threatened to run the 5-man team, gas, and beat [Valenzuela] more if he did not cease having his mental breakdown."  *Id.* ¶ 56.  In response, Valenzuela asked to be left alone.  *Id.*  But the unnamed lieutenant on duty proceeded to order Valenzuela's cell door to be opened so that he could be beaten again.  *Id.* ¶ 57.  However, an officer intervened and started talking with Valenzuela.  *Id.*  During this conversation, Valenzuela "ask[ed] several officers to join him while he prayed for everyone in the block and for Jesus Christ to bring justice to the world."  *Id.*  "Immediately after" making this request, Valenzuela suffered "an early posttraumatic

---

[10] It is not clear whether this was another report or if Cervantez is referring to the same report mentioned in paragraph 50.  *See* Dkt. No. 50 ¶¶ 50–51.

[11] Again, it is unclear whether this doctor observed Valenzuela directly or if he ordered these medications based on reports from other health professionals.  Dkt. No. 50 ¶ 53.

seizure, . . . vomited blood[,] and collapsed face-first on the concrete." *Id.* ¶ 58.  By the time

EMS arrived, he had no heart rhythm and was pronounced dead approximately an hour

later. *Id.* ¶¶ 55, 59.

 Following Valenzuela's death, Cervantez alleges that various individuals and Texas

agencies conspired to cover up the cause of his death.  *Id.* ¶¶ 60–62, 118–24.  First, an

unnamed representative from the Office of the Inspector General (OIG) visited the Wallace

Unit and collected statements from officers, medical staff, and inmates.  *Id.* ¶ 60.  The

consensus from inmate statements was that prison officials had used excessive force, but the

OIG took no further actions against any officials.  *Id.*  Then, the Tarrant County Medical

Examiner's Office stated that Valenzuela died due to "natural causes, and not excessive

force to the head and neck area; as was obvious based on his body and inmate reports." *Id.*

¶ 61.  In addition, the Texas Attorney General, Ken Paxton, and his office stated that

Valenzuela had died from exercising in his cell.  *Id.* ¶ 62.  In contrast, Cervantez claims that

pictures from an independent autopsy reveal that Valenzuela "was bruised and beaten from

head to toe with heavy bruising across his Adam's Apple (Larynx), which the 5 officers

crushed by their negligen[ce]."  Dkt. No. 54 at 2.

 **B.** **Procedural History**

 On August 1, 2022, Cervantez filed a complaint in Texas state court on behalf of

herself and as the representative of Valenzuela's estate.  *See* Dkt. No. 1-5 at 3–17.

Defendant Cris Love, TDCJ's Inspector General, then removed the case to federal court on

October 11, 2022.  Dkt. No. 1.  Since removal, Cervantez has twice amended her complaint

in response to motions to dismiss.  Dkt. Nos. 2; 5; 14–16; 50.  The current operative

pleading names 25 different defendants, *see* Dkt. No. 50 ¶ 1, eight of whom have been

dismissed, Dkt. Nos. 69; 77.

Cervantez's remaining claims are:

- Section 1983/Eighth Amendment claims against Frith, McGuire, Bastic, Harp, and Enriquez for excessive force against Valenzuela;

- Section 1983/Eighth Amendment claims against Valdez for excessive force due to his failure to videotape the use of force against Valenzuela;

- Section 1983/Eighth Amendment claims against Jody Hefner, the Warden of the Wallace Unit, for failing to train, supervise, and discipline correctional officers;

- Section 1983/Eighth Amendment claims against Castillo and Boedeker for failing to treat Valenzuela's medical needs;

- Section 1983/Eighth Amendment claims against Love; Cynthia Jumper, the Vice President of Health Policy and Special Health Initiatives for TTUHSC; and Denise DeShields, the Executive Medical Director of Managed Care for TTUHSC, for failing to train and supervise medical and mental-health staff "in properly recognizing, documenting, treating, and reporting excessive force by correctional staff against inmates";

- Section 1983/Eighth Amendment claims against Love for failing to prevent, monitor, and protect inmates from harm by themselves or staff;

- Americans with Disabilities Act (ADA) and Rehabilitation Act claims against TDCJ, TBCJ, and TTUHSC;

- Conspiracy claims against Castillo, Boedeker, Love, Paxton, and Nizam Peerwani, the Tarrant County Chief Medical Examiner, for "cover[ing] up the true origin of the injuries sustained by" Valenzuela;

- Section 1983/First Amendment claims against Castillo, Boedeker, Peerwani, Love, and Paxton for denying Valenzuela "and his heirs' access to the courts by concealing information and falsifying their findings" as to Valenzuela's cause of death;

- Interference with familial relationship claims against unspecified defendants;

- Wrongful death and survivorship claims against all defendants; and

- Medical malpractice claims against Castillo and Boedeker.

Dkt. No. 50 ¶¶ 64–128.[12]  The second amended complaint requests monetary damages and injunctive relief for these claims.  *Id.* ¶ 129.

### C.    Pending Motions

Currently pending before the Court are three sets of motions brought by 12 of the remaining 17 defendants seeking dismissal of the plaintiff's claims.  Dkt. Nos. 55; 56; 73. First, Castillo and Boedeker argue that they are shielded by qualified immunity as to the Section 1983 claims and governmental immunity under the Texas Tort Claims Act for the medical malpractice claims.  Dkt. No. 55 at 2.  Second, Peerwani has filed a motion for judgment on the pleadings,[13] asserting that he is also shielded by qualified immunity and that Cervantez has failed to state a claim of relief against him.  Dkt. No. 56 at 2.  Third, Valdez, Hefner, Love, Jumper, DeShields, Paxton, TDCJ, TBCJ, and TTUHSC (AG Defendants) argue that the claims against them should be dismissed due to qualified or sovereign immunity or for failure to state a claim.  Dkt. No. 73 at 7, 12–13.  In other words, all remaining defendants except the alleged members of the five-man team (Frith, McGuire,

---

[12] The second amended complaint also includes a blank equal protection claim.  *See* Dkt. No. 50 ¶ 117.  To the extent, the plaintiff is seeking to bring this claim, the Court dismisses it because the plaintiff fails to plausibly show any entitlement to relief.  *See id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[13] The Court notes that, while Peerwani has filed an answer styled as an amended answer to the second amended complaint, that answer predates the filing date of the second amended complaint. *See* Dkt. Nos. 45 at 1; 50.  At the time Peerwani filed his amended answer, Cervantez's motion to amend was still pending, *see* Dkt. Nos. 16; 45; 49, and rather than re-filing his answer after the newest complaint was filed, Peerwani moved for judgment on the pleadings, *see* Dkt. No. 56.  The Court need not resolve whether Peerwani's motion should be construed as a Rule 12(b)(6) or (c) motion because both motions are subject to the same standard.  *See Doe v. MySpace Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

Bastic, Harp, and Enriquez)[14] seek dismissal.  These motions are fully briefed and ripe for

resolution.[15]  *See* Dkt. Nos. 66; 68; 70; 78; 79.

## 2.      Legal Standards

### A.      Rule 12(b) and (c)

A complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Therefore, a plaintiff must allege

sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  A plaintiff's claim "has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).  This "plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id.*  If a complaint pleads facts that are "'merely consistent with' a defendant's

---

[14] Frith, McGuire, Bastic, Harp, and Enriquez have answered the complaint and acknowledged that whether they "are entitled to qualified immunity is heavily fact intensive," necessitating discovery prior to resolution.  *See* Dkt. Nos. 71; 80 at 1.  Accordingly, the Court will, in a separate order, direct the remaining parties to confer regarding a proposed scheduling order.

[15] In their reply, the AG Defendants request that the Court strike the plaintiff's response for noncompliance with Local Civil Rule 7.2(c), which limits briefs to 25 pages excluding the tables of contents and authorities unless a party obtains leave of court.  Dkt. No. 79 at 1–2; Loc. Civ. R. 7.2(c).  The plaintiff's response to the AG defendants' motion is 32 pages excluding those tables.  *See* Dkt. No. 78.  Notably, this is far from the first time that the plaintiff has failed to comply with the Court's rules or orders.  *See* Dkt. No. 64 (collecting "nine different missed deadlines or failures to comply with court orders").  Given this pattern, the Court would be within its right to strike the response.  But given that the motion to dismiss raises qualified immunity and therefore places a burden on the plaintiff to cite to authority to show that the right at issue was clearly established, striking the response would effectively require dismissal of those claims, which is a serious sanction.  Moreover, even considering the plaintiff's response, the Court concludes that the claims at issue must be dismissed, so any prejudice to the AG Defendants is minimal.  Nevertheless, the Court reiterates the importance of complying with its rules and warns the plaintiff that further noncompliance may result in sanctions.

liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Rule 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  Alternatively, after the pleadings are closed, a party may move for judgment on the pleadings under Rule 12(c) when "the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."  *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990)).  Motions under Rule 12(b)(6) and (c) are analyzed under the same standard.  *Doe v. MySpace Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  In resolving these motions, a court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff."  *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)).  However, this tenet does not extend to legal conclusions.  *Iqbal*, 556 U.S. at 678.  Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

In considering a Rule 12(b)(6) or (c) motion, "a district court must limit itself to the contents of the pleadings, including attachments thereto."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *see Great Plains Tr. Co.*, 313 F.3d at 313.  If a court is presented with and does not exclude matters outside the pleadings, it must convert the motion to a motion for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).

Relatedly, a plaintiff may not amend her complaint through her response to a motion to dismiss.  *United States ex rel. Grynberg Prod. Corp. v. Kinder Morgan CO2 Co.*, 491 F. Supp.

3d 220, 231–32 (N.D. Tex. 2020). Any "[n]ew facts submitted in response to a motion to dismiss to defeat the motion are not incorporated into the original pleadings." *Coach, Inc. v. Angela's Boutique*, No. H-10-1108, 2011 WL 2446387, at *2 (S.D. Tex. June 15, 2011). So when a plaintiff attempts to shift the grounds upon which her claims are premised through new facts or claims not present in the complaint, courts disregard these assertions when resolving a motion to dismiss. *See Grynberg Prod. Corp.*, 491 F. Supp. 3d at 231–32; *Phalanx Grp. Int'l v. Critical Sols. Int'l*, No. 3:18-CV-244-B, 2019 WL 954727, at *6 (N.D. Tex. Feb. 26, 2019). Cervantez's responses to the pending motions substantially attempt to recast her claims and insert new allegations for the first time. For example, the plaintiff's second amended complaint raises ADA and Rehabilitation Act claims premised on failures to adequately train, Dkt. No. 50 ¶ 115, but her response to the AG Defendants' motion to dismiss frames these claims as denials of medical treatment, Dkt. No. 78 at 30–31. Similarly, despite no allegations in the complaint describing any physical injuries suffered by Valenzuela, *see* Dkt. No. 50 ¶¶ 47–51, 54, she now claims that he had "serious bruising," a "visibly broken neck, [and a] battered body," Dkt. No. 68 at 10. And despite repeatedly claiming in her complaint that Valenzuela was beaten by a five-man team, *e.g.*, Dkt. Nos. 50 ¶¶ 47–51, 56, she now includes Valdez as a sixth officer involved in the use of force, at least in some statements in her response, Dkt. No. 78 at 20; *but see id.* at 30–31. The Court need not provide a full listing of all of the novel allegations and arguments raised for the first time in the responses, but it will not consider them in determining whether the plaintiff has stated claims against the movant defendants.

B.      Removal and Immunity

Ordinarily, a state, its instrumentalities, and its officials, when sued in their official capacity, are shielded from suit in federal court by sovereign immunity.  *See Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005).  However, a "[s]tate's action of voluntarily agreeing to remove the case to federal court constitute[s] a form of voluntary invocation of the federal court's jurisdiction and a waiver of its [sovereign] immunity."  *Id.* at 242.  This waiver is cabined by two key principles.  First, the waiver extends only to those defendants who joined in the removal because otherwise a state has not taken an affirmative act waiving immunity.  *See Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546–47 (5th Cir. 2006); *Huang v. Huang*, 846 F. App'x 224, 230 (5th Cir. 2021).  Second, a waiver of immunity from suit in federal court is distinct from immunity from liability, which may be retained after removal.  *Meyers*, 410 F.3d at 255.  Likewise, removing a case to federal court does not act as a waiver of a defendant's qualified immunity.  *Gilani v. Univ. of Tex. Sw. Med. Ctr.*, No. 3:21-CV-1461-N, 2023 WL 2518811, at *4 (N.D. Tex. Mar. 13, 2023); *Gresham v. Fischer*, No. A-14-CV-739-LY, 2015 WL 4068638, at *3–4 (W.D. Tex. July 1, 2015); *see also Betts v. Brennan*, 22 F.4th 577, 581–82 (5th Cir. 2022) (granting qualified immunity to a defendant who removed the case to federal court).

As previously stated, this case was removed to federal court by defendant Love, Dkt. No. 1, thereby waiving his ability to assert sovereign immunity.  But no other defendant joined the removal to federal court, and the other defendants had not been properly served at the time of removal.  *See id.*; *see also* Dkt. Nos. 1-2 at 2, 5; 1-5 at 98–103; Tex. R. Civ. P. 107(c) (requiring an addressee's signature on a return receipt for a citation served by certified mail).  Accordingly, they retain sovereign immunity as applicable.  *See Huang*, 846

– 12 –

F. App'x at 230.  Moreover, Love and the other individual defendants have not waived

qualified immunity despite removal.  *Gilani*, 2023 WL 2518811, at *4.

3.      **Analysis**

        The Court grants the motions to dismiss in full and dismisses all claims raised against

the movant defendants.  First, Cervantez has affirmatively abandoned certain claims—

namely, her request for an injunction and any state-law claims.  Second, Cervantez's ADA

and Rehabilitation Act claims fail because she has not plausibly alleged that Valenzuela was

a qualified individual under the Acts or that he suffered from intentional discrimination.

Third, the individual defendants are entitled to qualified immunity as to the Section 1983

claims against them.

        A.    **The Court dismisses any request for injunctive relief and any independently
              asserted state-law claims because the plaintiff has stated that she is not
              pursuing them.**

        As a preliminary matter, while the second amended complaint includes a request for

injunctive relief and seemingly raises independent state-law claims, the plaintiff's filings

affirmatively state that she is not pursuing such claims.  Accordingly, the Court dismisses

these claims and requested relief to the extent they are raised in the second amended

complaint.  Specifically, Cervantez initially sought injunctive relief in addition to damages

but has now abandoned the request for injunctive relief.  Dkt. Nos. 50 ¶ 129; 78 at 15.  And

while her complaint listed wrongful death, survivorship, and state-law medical negligence as

independent claims, she noted in a response that she "is not seeking state law claims."  Dkt.

Nos. 50 ¶¶ 127–28; 68 at 21.  Accordingly, the Court construes her wrongful-death and

survivorship allegations as theories of recovery for her other asserted claims rather than

independent claims, *see Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 208–10 (5th Cir.

2016), and it dismisses her state-law medical-negligence claims against Boedeker and Castillo.

       **B.**      **The Court dismisses the plaintiff's ADA and Rehabilitation Act claims.**

Cervantez raises ADA and Rehabilitation Act claims against the entity defendants, TDCJ, TBCJ, and TTUHSC. Dkt. No. 50 ¶¶ 114–16. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Such public entities include state governments and their instrumentalities, such as state prisons. *Id.* § 12131(1)(A)–(B); *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020); *Hacker v. Cain*, 759 F. App'x 212, 215 (5th Cir. 2018). The Rehabilitation Act similarly prohibits recipients of federal funding from discriminating against persons with disabilities. *See* 29 U.S.C. § 794(a). Both statutes contain similar language, and "[j]urisprudence interpreting either section is applicable to both." *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002) (alteration in original) (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)). Accordingly, the Court addresses the plaintiff's ADA and Rehabilitation Act claims together.

To state a claim under the ADA and Rehabilitation Act, a plaintiff must show:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Smith*, 956 F.3d at 317 (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). In addition, to recover compensatory damages, a plaintiff must show

"intentional discrimination."  *Id.* at 318 (quoting *Delano-Pyle*, 302 F.3d at 574).  This generally "requires that the defendant at least have actual notice of a violation."  *Miraglia v. Bd. of Supervisors of the La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018).

The Court dismisses the ADA and Rehabilitation Act claims.  The plaintiff has not plausibly alleged that Valenzuela was a qualified individual or that he was denied the benefits of a program, service, or activity or otherwise discriminated against by reason of any disability.

### i.    Qualified Individual

To be a qualified individual under the ADA or Rehabilitation Act, an individual must be suffering from a qualifying disability, which is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Hacker*, 759 F. App'x at 215.  A mere allegation that an individual has an impairment is insufficient—"a plaintiff 'also need[s] to demonstrate that the impairment substantially limits a major life activity.'"  *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023) (alteration in original) (quoting *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009)).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as "the operation of a major bodily function."  42 U.S.C. § 12102(2).  Per se disabilities do not exist under the ADA or Rehabilitation Act, so a plaintiff must allege facts demonstrating the actual and substantial impact of the impairment on a major life activity.  *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th

Cir. 2011).  Accordingly, "[d]etermining whether a plaintiff has a disability . . . requires an individualized assessment of the impact of the impairment on an individual's major life activities."  *Mueck*, 75 F.4th at 479.

The defendants argue that Valenzuela was not a qualified individual because Cervantez asserts only that he was suffering a mental-health crisis, not that he had any specific impairment, and further failed to provide any factual allegations as to how it interfered with one or more major life activities.  Dkt. No. 73 at 28.   In response, Cervantez points to Valenzuela's behavior leading up to his death, specifically that "[h]e was reportedly seen naked, putting his head in the toilet, smearing feces in the cell, yelling at people who were not there, yelling that he wanted to die, and not responding to officer commands."  Dkt. No. 78 at 29–30; *see* Dkt. No. 50 ¶ 47.  But alleging that an individual is suffering a mental-health crisis is not enough to allege a qualifying disability because it does not assert that he has a specific impairment that substantially limits a major life activity. Courts have routinely held that allegations of a "psychotic episode" or suicidal ideation unaccompanied by a claim of a specific impairment are insufficient.  *Briley v. Barreca*, No. 20-907, 2020 WL 6269715, at *5 (E.D. La. Oct. 26, 2020); *Martin v. Brown Schs. Educ. Corp.*, No. 3:02-CV-144G, 2003 WL 21077454, at *5 (N.D. Tex. Mar. 14, 2003); *see also Wade v. Montgomery County*, No. 4:17-CV-1040, 2017 WL 7058237, at *6 (S.D. Tex. Dec. 6, 2017) (collecting cases), *report and recommendation adopted by* 2018 WL 580642 (Jan. 25, 2018).  At no point does the plaintiff identify any specific condition from which Valenzuela was suffering.  *See generally* Dkt. No. 50.  The closest allegation notes that he was prescribed seizure medication, but it also clarifies that "he had not had a seizure in a long time" and gives no indication that he had seizures that interfered with a major life activity.  *Id.* ¶ 46.

Cervantez's allegations about Valenzuela's conduct are insufficient to plausibly claim that he was a qualified individual, and her claims under the ADA and Rehabilitation Act fail on this basis alone.

### ii.   Intentional Discrimination

Even if Cervantez's allegations sufficiently established that Valenzuela was a qualified individual, her ADA and Rehabilitation Act claims are nevertheless dismissed for failing to sufficiently allege the second element of the claim.  As alleged in the second amended complaint, Cervantez claims discrimination based on a failure to train, supervise, and discipline prison officials and the failure of the officers to follow policies regarding individuals with "mental health disabilities."  Dkt. No. 50 ¶ 115.  But the Fifth Circuit has previously rejected a plaintiff's argument that failure to follow policies qualifies as a denial of benefits of services, programs, or activities for ADA purposes.  *Hainze*, 207 F.3d at 800–01; *see also Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015) (noting that "the relevant inquiry is whether [the defendant] violated the ADA or Section 504 of the Rehabilitation Act, not whether [it] followed its internal policies").  And it has not recognized the existence of an ADA or Rehabilitation Act claim based on a failure-to-train theory.  *See Brown v. Coulston*, 463 F. Supp. 3d 762, 782 n.7 (E.D. Tex. 2020); *Chupka ex rel. C.C. v. Pflugerville Indep. Sch. Dist.*, No. 1:21-CV-232-RP, 2021 WL 2722812, at *5 (W.D. Tex. Mar. 29, 2021).  This Court need not resolve whether such a claim is cognizable because the plaintiff has abandoned this theory in her briefing on the motions.[16]  *See* Dkt.

---

[16] There is substantial disagreement in the federal courts over whether failure-to-train claims are cognizable under the ADA.  The Sixth Circuit has rejected such claims because a failure to train affects all persons, not just the claimant, so it cannot demonstrate the intentional discrimination

No. 78 at 29–35.  She now instead argues that the defendants violated the ADA and Rehabilitation Act by depriving Valenzuela of medical and mental-health services.  *Id.* at 31.

Putting aside the issue that this theory for these claims was not raised in her pleadings, *see* Dkt. No. 50 ¶¶ 114–16, her other allegations belie the argument that any denial of medical treatment was due to any claimed disability.  Insufficient medical care "does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability."  *Lee v. Valdez*, No. 3:07-CV-1298-D, 2009 WL 1406244, at *13 (N.D. Tex. May 20, 2009) (emphasis in original) (quoting *Marlor v. Madison County*, 50 F. App'x 872, 873 (9th Cir. 2002)).  Assuming for the sake of argument that Cervantez has plausibly alleged a denial of medical or mental-health treatment,[17] she asserts that the "purposeful behavior" of ignoring any medical or mental-health needs "was done to cover-up the excessive force of TDCJ officers."  Dkt. No. 50 ¶ 66.  Moreover, she asserts that TDCJ staff had attempted to get Valenzuela a bed placement in Crisis Management, but there were insufficient beds so

---

required under the ADA.  *See Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005), *abrogated on other grounds as recognized by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015).  Other circuits have declined to decide the issue.  *See Buchanan v. Maine*, 469 F.3d 158, 177 (1st Cir. 2006); *Thao v. City of St. Paul*, 481 F.3d 565, 568 (8th Cir. 2007); *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1297 (10th Cir. 2016).  The Second Circuit has recognized a failure-to-train claim in the context of Title III of the ADA, *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156–58 (2d Cir. 2008), which is not applicable here.  Nevertheless, some district courts have recognized these claims.  *See Snyder v. United States*, No. 1:23-CV-176-BLW, 2023 WL 5000736, at *2 (D. Idaho Aug. 4, 2023) (collecting cases in the Ninth Circuit finding failure-to-train ADA claims cognizable); *Est. of LeRoux v. Montgomery County*, No. 8:22-CV-856-AAQ, 2023 WL 2571518, at *16 (D. Md. Mar. 20, 2023) (similar).  Given the plaintiff's own failure to argue that a failure-to-train ADA claim is cognizable, the Court does not wade into this debate.

[17] It appears that the failure to treat pertains to the actions of Castillo and Boedeker, but besides a conclusory statement in her cause-of-action section, Cervantez does not allege that they failed to provide necessary medical treatment.  *See generally* Dkt. No. 50.  Instead, her factual allegations as to them center on a failure to document the extent of injuries and their cause.  *Id.* ¶¶ 42–51.  Cervantez does allege that a medical doctor ordered a sedative that was not administered to Valenzuela, but she does not allege that the sedative was needed or specifically tie any harm to Valenzuela to a failure to administer the sedative.  *See id.* ¶ 52.

he was placed on the waiting list.  *Id.* ¶¶ 40, 47–48.  Thus, based on Cervantez's own allegations, any benefits of medical services or mental-health bed placement were denied due to resource constraints or as part of a cover-up, not Valenzuela's mental-health condition.  Accordingly, the plaintiff has not sufficiently alleged intentional discrimination based on a qualifying disability, and the Court dismisses the ADA and Rehabilitation Act claims.[18]

### C.    The Court dismisses the plaintiff's Section 1983 claims against the movant defendants.

Section 1983 provides a cause of action for plaintiffs when their constitutional or federal statutory rights are deprived by any person acting "under color of any statute, ordinance, regulation, custom, or usage" of the State.  42 U.S.C. § 1983.  "A [S]ection 1983 complaint must plead specific facts and allege a cognizable constitutional violation in order to avoid dismissal for failure to state a claim."  *Mills v. Crim. Dist. Ct. No. 3*, 837 F.2d 677, 678 (5th Cir. 1988).  "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."  *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).  To establish liability under Section 1983, a plaintiff must satisfy two elements: (1) a deprivation of a federal right, and (2) the person who deprived the plaintiff of that right acted under color of state law.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

---

[18] The plaintiff's ADA and Rehabilitation Act claims are also dismissed as to the TBCJ for an additional basis—there are no factual allegations as to any actions by a TBCJ employee or the entity itself related to Valenzuela prior to his death.  *See generally* Dkt. No. 50.  Moreover, the plaintiff's own argument in her response to the motion to dismiss only points to allegations regarding TTUHSC and TDCJ staff.  Dkt. No. 78 at 31.

Cervantez asserts a variety of Section 1983 claims against the individual movant defendants.  The Court dismisses each of these claims.  She has not sufficiently shown that Valdez's conduct constituted an excessive use of force in violation of the Eighth Amendment and cites no caselaw to show that any right in question was clearly established.  She has not plausibly alleged that either Castillo or Boedeker was deliberately indifferent to Valenzuela's medical needs.  Nor has she overcome the supervisor officials' qualified immunity as to her failure-to-train claims.  Finally, the defendants are also entitled to qualified immunity as to her conspiracy, denial of access to courts, and deprivation of familial relationships claims.

### i.   Qualified Immunity

When government officials—like prison officials—perform discretionary functions, they are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Accordingly, officials are protected by qualified immunity unless their actions violate a right that is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 349–50 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  A right may be clearly established even in the absence of a case with "materially similar" facts "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  *Id.* at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002)).  The key is that an official had "fair warning" that his conduct was unlawful.  *Id.*

Qualified immunity has two prongs: (1) whether the plaintiff has asserted a violation of a constitutional right; and (2) whether that right was clearly established at the time. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). A court may resolve the qualified immunity question based on either component, so it need not determine whether there was a constitutional violation if the right was not clearly established. *See id.* "The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in [her] favor." *Id.* (citation omitted). Consequently, to survive a motion to dismiss when the defendants properly raise qualified immunity, the complaint must "assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (quoting *Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). As a result, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm [she] has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* Ultimately, "'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018)).

A plaintiff may show that a right was clearly established in two ways. *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, she can show a case or body of relevant law where an official was held to have violated the Constitution under similar circumstances. *Id.* Under this approach, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). So a plaintiff "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree

of particularity." *Smith v. Davis*, 507 F. App'x 359, 361 (5th Cir. 2013) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc)).  Alternatively, in rare circumstances, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Batyukova*, 994 F.3d at 726 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)); *see also Taylor v. Riojas*, 592 U.S. 7, 9 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").  Importantly, the plaintiff "has the burden to point out the clearly established law." *Culberson v. Clay County*, 98 F.4th 281, 286 (5th Cir. 2024) (quoting *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019)).  A plaintiff who "fail[s] to point to any case—sufficiently analogous or otherwise—supporting the proposition that the alleged constitutional violation was of clearly established law" forfeits any argument as to this prong of qualified immunity, thereby necessitating dismissal of her claims.  *Id.* at 287.

### ii.   Excessive Force

A prison official violates the Eighth Amendment's prohibition on cruel and unusual punishment if his use of force against an inmate constitutes an "unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  To state an excessive-force claim, a plaintiff must plausibly assert that the force was applied "maliciously and sadistically to cause harm," not "in a good-faith effort to maintain or restore discipline." *Id.* at 7.

Cervantez asserts that Officers Frith, McGuire, Bastic, Harp, Enriquez, and Valdez violated Valenzuela's Eighth Amendment rights by using excessive force on him.  Dkt. No. 50 ¶ 64.  Frith, McGuire, Bastic, Harp, and Enriquez allegedly formed the five-man team

that entered Valenzuela's cell and beat, choked, and sprayed him with a chemical agent.  *Id.* ¶¶ 47, 51.  These officers have not sought dismissal and agree that discovery is necessary to resolve the excessive-force claims against them.  *See* Dkt. No. 80.

Valdez, however, asserts the excessive-force claim against him should be dismissed because he is not alleged to have used any force against Valenzuela.  Dkt. No. 73 at 20. Instead, the sole factual allegation as to any action taken by Valdez is that he "operated the camera," presumably in Valenzuela's cell, during the assault and "intentionally pointed it at the ground to obstruct later legal action by the Valenzuela family."[19]  Dkt. No. 50 ¶ 47. Cervantez does not allege Valdez's actions caused any physical injury to Valenzuela.  *See generally id.*  Valdez's operation of a camera and refusal to film the alleged assault is not a use of force against Valenzuela and certainly cannot constitute an unnecessary and wanton infliction of pain.  And even if such operation of a camera could ever constitute an excessive-force claim, Cervantez fails to cite a single case where an officer's operation of a camera or failure to film constituted a constitutional violation, much less an Eighth Amendment excessive-force claim.[20]  *See generally* Dkt. No. 78.  Accordingly, she has failed to carry her burden to show that a reasonable officer would have been on notice that his operation of a camera during an assault might violate an inmate's Eighth Amendment rights, and therefore, Valdez retains his qualified immunity.  *See Culberson*, 98 F.4th at 286– 87.  The Court therefore dismisses the excessive force claim as to Valdez.

---

[19] In her response to the motion to dismiss, Cervantez asserts, for the first time, that Valdez "was one of six officers sent into [Valenzuela's] cell who beat him to death."  Dkt. No. 78 at 20.  The Court does not consider this claim in resolving this motion.  *See supra* Section 2.A.

[20] Indeed, Cervantez's response bizarrely addresses Valdez's argument that he has qualified immunity solely by referencing caselaw pertaining to supervisory liability.  *See* Dkt. No. 78 at 20– 21, 26–28.  There is no indication in the record that Valdez had any supervisory role, and no such claim is raised against him in the second amended complaint.  *See generally* Dkt. No. 50.

### iii.    Deliberate Indifference to Medical Needs

Cervantez also alleges that Castillo and Boedeker violated Valenzuela's Eighth Amendment right against cruel and unusual punishment by failing to provide adequate medical treatment to care for his serious medical needs.  Dkt. No. 50 ¶ 66.  The Court dismisses these claims because Cervantez has failed to allege that the nurses were deliberately indifferent.

The Eighth Amendment "does not, by its precise words, mandate a certain level of medical care for prisoners."  *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).  However, as the Supreme Court has explained, the Eighth Amendment requires that prison officials "ensure that inmates receive adequate . . . medical care."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when [her] conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'"  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

To demonstrate deliberate indifference, a plaintiff must allege facts showing that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"; (2) the official actually drew the inference that a substantial risk of serious harm existed; and (3) the official "disregard[ed]" the risk.  *Farmer*, 511 U.S. at 837; *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).  Therefore, the official must have been "subjectively aware of the risk of serious harm to the inmate."  *Easter*, 467 F.3d at 463 (cleaned up) (quoting *Farmer*, 511 U.S. at 829).  Nevertheless, under exceptional circumstances, "a prison official's knowledge of a substantial risk of harm may be inferred if

the risk was obvious." *Id.* "This exception has been applied in cases where the severity of

the risk or injury is obvious or the cause of that injury or harm is plainly evident to the

officer." *Brooks v. Taylor County*, No. 1:20-CV-049-H, 2021 WL 3039016, at *5 (N.D. Tex.

July 19, 2021).

Still, courts have been cautioned that they "should be careful to ensure that the

requirement of subjective culpability is not lost." *Anderson v. Dallas County*, 286 F. App'x

850, 860 (5th Cir. 2008) (quoting *Farmer*, 511 U.S. at 843 n.8). Thus, allegations "that a

reasonable person would have known[] or that the defendant should have known" are

insufficient. *Id.* (quoting *Farmer*, 511 U.S. at 843 n.8). Supreme Court precedent explains

that "an official's failure to alleviate a significant risk that he should have perceived but did

not, while no cause for commendation, cannot under [its] cases be condemned as the

infliction of punishment." *Farmer*, 511 U.S. at 838.

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't

of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). A "plaintiff must show that officials

'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or

engaged in any similar conduct that would clearly evince a wanton disregard for any serious

medical needs.'" *Id.* (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

Neither malpractice nor negligent care rise to the level of a constitutional violation. *Stewart

v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). Even gross negligence is not sufficient.

*Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021). "[T]he decision whether to

provide additional treatment" does not meet this standard, either. *Gobert v. Caldwell*, 463

F.3d 339, 346 (5th Cir. 2006) (quoting *Domino*, 239 F.3d at 756). "Further, delay in medical

care can only constitute an Eighth Amendment violation if there has been deliberate

indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Here, Cervantez has failed to allege sufficient facts to overcome the high hurdle of deliberate indifference, so Castillo and Boedeker are entitled to qualified immunity. The central factual allegations as to these defendants are that they made various medical reports after alleged assaults by officers that stated that Valenzuela had no visible injuries besides a bloody nose. Dkt. No. 50 ¶¶ 49–51. As to Castillo, Cervantez also alleges that she "responded to the spectacle of [Valenzuela] being beaten by Frith." *Id.* ¶ 46. Taking these allegations as true, Cervantez fails to plausibly allege that Valenzuela had a serious medical need known to these nurses to which they were deliberately indifferent. There are no factual allegations demonstrating that they knew of any serious injury to Valenzuela requiring medical intervention. *See id.* ¶¶ 46–51. Even if the Court credits the conclusory claim that their reports of the extent of his physical injuries were false, Cervantez does not allege what his known physical injuries were at the time the nurses presumably saw him.[21] *See id.* And while Cervantez has now claimed that, at an independent autopsy taken at some point after his death, Valenzuela's body was bruised with "heavy bruising across his Adam's Apple," she still does not allege that this bruising was present at the time the nurses saw him. Dkt. No. 54 at 2. Moreover, there are no allegations as to the extent of an evaluation, if any, that these nurses performed that would have provided them with any knowledge of the extent of his injuries besides possibly observing visible bruises. Dkt. No.

---

[21] Again, the plaintiff does not specifically allege that the nurses saw Valenzuela after the alleged beatings by the five-man team. Dkt. No. 50 ¶¶ 49–50. Instead, Cervantez claims that they drafted medical reports, from which one could generously infer that their documentation was based on their personal treatment of Valenzuela rather than secondhand accounts by other staff. *Id.*

50 at ¶¶ 46–51.  And Cervantez fails to identify any treatment that the nurses could have provided that would have improved Valenzuela's condition or avoided his death.  *Id.* ¶¶ 46–59.

The Court cannot infer from the mere allegations that Valenzuela suffered blunt force trauma to the head and was strangled that (a) the nurses were aware that this had occurred, (b) they saw serious injuries, and (c) they knew he had a serious medical need that they left untreated.  *See id.*  Such inferences require greater supporting factual allegations, because even if a person's "physical state could have allowed the [government officials] to infer [he] was at substantial risk of serious harm," the plaintiff must "present facts which plausibly show that these [officials] *actually* drew that inference."  *See Brannan v. City of Mesquite*, No. 3:19-CV-1263-X, 2020 WL 7344125, at *8 (N.D. Tex. Dec. 14, 2020) (emphasis in original).  For example, a court inferred actual knowledge of a risk and conscious disregard of it by nurses who: (1) "observed first-hand the large holes developing in [the inmate's] skin" based on their direct medical treatment of the inmate; and (2) received "specific mandatory orders" about necessary medical treatment from staff at hospitals where the inmate was repeatedly treated; but (3) nevertheless failed to follow those instructions.  *See Lawson v. Dallas County*, 286 F.3d 257, 262–63 (5th Cir. 2002).  In contrast, a nurse's "knowledge of and inattention to symptoms consistent with the flu or a bad cold" was insufficient to infer deliberate indifference.  *Est. of Cheney ex rel. Cheney v. Collier*, 560 F. App'x 271, 274–75 (5th Cir. 2014).

Like the mere symptoms of a flu at issue in *Estate of Cheney*, visible bruises are not so severe as to permit an inference that any medical provider who saw them actually knew of an acute need for medical treatment.  Cervantez provides no factual allegations to the

contrary.  She does not even allege that Valenzuela made any reports of pain or concern to these nurses or told them that he had been beaten.  *See* Dkt. No. 50 ¶¶ 46–51.  And even if these allegations suggest that the nurses were negligent by not further investigating the extent of his injuries, negligence—even gross negligence—is insufficient for deliberate indifference.  *Aguirre*, 995 F.3d at 420; *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1996) (noting that medical decisions to not order additional diagnostic techniques are matters of medical judgment and "do[] not represent cruel and unusual punishment").

Moreover, Castillo and Boedeker were not the only medical providers involved in Valenzuela's treatment after the alleged assaults, which further undermines Cervantez's contention that the nurses were deliberately indifferent to Valenzuela's serious medical needs.  A doctor ordered various medications to try to treat Valenzuela's mental-health crisis and to prevent seizures about an hour after Castillo and Boedeker's documentation.  *See* Dkt. No. 50 ¶ 53.  Thus, to the extent Cervantez now asserts that they "act[ed] as gatekeepers to treatment from a doctor," Dkt. No. 68 at 10, this allegation is belied by Cervantez's allegation in her complaint that evidences that the nurses must have sought further aid for Valenzuela beyond their own direct care.  Dkt. No. 50 ¶ 53. And Cervantez does not allege that the one-hour delay between the nurses' documentation and the doctor's treatment itself caused substantial harm.  *See* Dkt. No. 50 ¶¶ 51–53; *see also Mendoza*, 989 F.2d at 195.

In sum, Cervantez has not plausibly alleged that Castillo and Boedeker were deliberately indifferent to a serious risk to Valenzuela's health.  The Court therefore concludes that they are entitled to qualified immunity and dismisses this claim against them.

### iv.    Failure to Train, Supervise, or Discipline

Cervantez next asserts claims against Hefner, Love, Jumper, and DeShields related to the actions of the prison officials who allegedly beat Valenzuela and failed to properly document and treat his injuries and their cause. *See* Dkt. No. 50 at ¶¶ 65, 68, 111–13. Section 1983 does not impose vicarious liability on supervisors. *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003). Consequently, "a plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation." *Id.* (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)). For these four defendants, Cervantez provides no factual allegations from which the Court could plausibly infer any personal involvement with the claimed injuries to Valenzuela. *See* Dkt. No. 50 ¶¶ 10, 65 (Hefner); *id.* ¶¶ 12, 68, 70, 111–13 (Love); *id.* ¶¶ 14, 68 (Jumper); *id.* ¶¶ 15, 68 (DeShields). Instead, her allegations pertain to their responsibilities to train and supervise others. *See generally id.*

Supervisors may be held personally liable under a failure-to-train theory when (1) "the [supervisor] failed to train or supervise the [officials] involved; (2) "there is a causal connection between the alleged failure to supervise or train and the alleged violation of the [individual's] rights"; and (3) "the failure to train or supervise constituted deliberate indifference to the [individual's] constitutional rights." *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 286 (5th Cir. 2002) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). Importantly, a plaintiff must allege "a pattern of similar violations" because a single instance "will not sustain a plaintiff's claim that such a lack of training or supervision cause a violation of [] constitutional rights." *Id.* at 286–87. Moreover, "the training's inadequacy 'must be obvious and obviously likely to result in a constitutional violation.'"

*Id.* at 287 (quoting *Thompson*, 245 F.3d at 459).  Otherwise, a plaintiff cannot plausibly allege deliberate indifference, which requires showing that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and also actually drew that inference.  *Est. of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quotation omitted).  In sum, "[t]he threshold for pleading a failure-to-supervise [or train] claim is high."  *Tuttle v. Sepolio*, 68 F.4th 969, 975 (5th Cir. 2023).

Cervantez has alleged that Hefner, Love, Jumper, and DeShields are responsible for training individuals who had some personal interactions with Valenzuela.[22]  *See* Dkt. No. 50 ¶¶ 10, 12, 14–15, 65, 68, 111–13.  But her conclusory allegations fail to state a failure-to-train claim as to any of these defendants.  For one, her allegations as to the failure to properly train and supervise are conclusory.  *Id.* ¶¶ 65, 68, 111–13.  Without any supporting facts, she claims that Love, Jumper, and DeShields

> caused the constitutional violations by reason of their practice and custom, with deliberate indifference, of failing to properly train, supervise and discipline medical and mental healthcare staff, including the defendant medical providers, in properly recognizing, documenting, treating, and reporting excessive force by correctional staff against inmates, especially those inmates experiencing a mental health crisis.

*Id.* ¶ 68.  Her claims against Hefner are similar.  Again, without any factual allegations, she asserts that he failed to properly train and supervise: (1) correctional officers in the proper use of force; (2) correctional officers to handle "situations involving emotionally disturbed persons and in the proper means of detaining or protecting such persons from harming

---

[22] This is a generous reading of Cervantez's allegations as to Love.  She states that he was TDCJ's Inspector General and "failed to train his staff within TDCJ to prevent, monitor, and protect inmates from harm," but she does not specifically claim that he had training responsibilities.  *See* Dkt. No. 50 ¶¶ 12, 68, 70, 111–13.

themselves or others"; and (3) "healthcare providers working within the prison system on how to identify and document excessive force carried out by correctional staff."  *Id.* ¶ 65. She provides no basis to plausibly infer that training and supervision were not provided other than her allegations as to what happened to Valenzuela and that other inmates died while in custody.  *See generally id.*  But such *ipso facto* allegations are insufficient to state a claim.  *See Henderson v. Harris County*, 51 F.4th 125, 131 (5th Cir. 2022).  A plaintiff cannot merely contend that there is insufficient training without any specific facts to support that claim.  *Id.*  Instead, Cervantez's allegations are mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which cannot survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.

Even if these conclusory claims were sufficient to allege the existence of insufficient training or supervision, Cervantez has not plausibly alleged deliberate indifference by these supervisors.  To satisfy this element, she must allege "a pattern of *similar* violations," not simply previous bad or unwise acts.  *Est. of Davis*, 406 F.3d at 383 (emphasis in original).  These prior acts must "be fairly similar to what ultimately transpired and, in the case of excessive use of force, . . . have involved injury to a third party."  *Id.*  Cervantez attempts to satisfy this pattern requirement by listing 40 inmates who died in TDCJ custody from various circumstances, most of which were due to suicide or unspecified causes.  *See* Dkt. No. 50 ¶¶ 71–110.  Importantly, none of these tragic deaths are claimed to have been caused by excessive force by prison officials.  *See id.*  And Cervantez does not allege that any of these deaths involved improper or incorrect documentation as to whether excessive force was involved.  *See id.*  Accordingly, none of these examples are similar to her claims as to

what occurred in this case, and they therefore cannot constitute a pattern of violations to state a claim for a supervisor's failure to train or supervise. *Est. of Davis*, 406 F.3d at 383.

In extremely rare cases, a plaintiff can state a failure-to-train case based on a single incident. *Henderson*, 51 F.4th at 131. But "[t]he single-incident exception 'is generally reserved for those cases in which the government actor was provided *no training whatsoever*,'" not simply "a failure to train in one limited area." *Id.* (emphasis in original) (quoting *Hutcheson v. Dallas County*, 994 F.3d 477, 483 (5th Cir. 2021)); *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (quotation omitted). In addition, a plaintiff must "prov[e] 'that the highly predictable consequence of a failure to train would result in the specific injury suffered,'" which requires a failure to train employees about "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Henderson*, 51 F.4th at 131 (quoting *Hutcheson*, 994 F.3d at 482–83). Cervantez does not argue that this single-incident exception applies. *See generally* Dkt. Nos. 50; 78. Nor does she affirmatively allege that the officers involved received no training[23] or that this occurrence was the "highly predictable consequence" of such failure. *See* Dkt. No. 50; *Henderson*, 51 F.4th at 131 (quoting *Hutcheson*, 994 F.3d at 482. Accordingly, the Court dismisses the failure to train, supervise, and discipline claims.

---

[23] And to the extent Cervantez tries to now claim that the officials had a policy of failing to train, this is contradicted by her allegations of a failure "to *properly* train," Dkt. No 50 ¶¶ 65, 68 (emphasis added), and statements in other filings. For example, in her response to Castillo and Boedeker's motion to dismiss, she says that the nurses had training and thus understood that that Valenzuela's injuries were serious; but, Cervantez claims they did not follow this training "due to bias and pressure from correctional staff." Dkt. No. 68 at 11; *see also* Dkt. No. 78 at 26 (noting that the five-man team received some training). Moreover, a claim of a policy of completely failing to train is still insufficient in the absence of allegations that the officers involved were not trained. *See Henderson*, 51 F.4th at 131–32.

Cervantez also argues that Love is liable as a policymaker for TBCJ and/or TDCJ.[24] *See* Dkt. Nos. 50 ¶ 70; 78 at 28. This claim is dismissed as well. Policymaker liability requires alleging that the official "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Cozzo*, 279 F.3d at 289 (quoting *Thompkins*, 828 F.2d at 304). Policies are either (1) "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government entity or by an official to whom the entity has delegated policy-making authority"; or (2) persistent and widespread practices by employees that are "so common and well settled as to constitute a custom that fairly represents the entity's policy." *Id.* (cleaned up) (quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992)). Such policymaker claims require a "description of a policy or custom and its relationship to the underlying constitutional violation" based on "specific facts," not vague and conclusory claims. *Peña*, 879 F.3d at 622 (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

The only policy hinted at in the second amended complaint is a reference to a "policy of failing to protect inmates from harm." *See* Dkt. No. 50 ¶ 125. But the complaint fails to identify any specific policymaker or entity that promulgated this "policy." *See id.* And this is a conclusory and vague statement, unaccompanied by any allegation of a specific decision or statement officially adopted by a government entity or examples of incidents similar to what occurred here. *See generally id.*; *cf. Cozzo*, 279 F.3d at 289. A court cannot infer "the existence of a constitutionally deficient policy" based on "a single

---

[24] Cervantez alleges that "Love is the official policymaker for TBCJ," but she appears to be asserting that Love is also liable for TDCJ's policies or lack thereof. Dkt. No. 50 ¶ 70.

wrongful act." *Thompkins*, 828 F.2d at 304.  Accordingly, the Court dismisses any policymaker claim against Love.

### v.     Denial of Access to Courts and Conspiracy

Cervantez also raises denial of access to courts and conspiracy claims against Peerwani, Castillo, Boedeker, Paxton, and Love.  Dkt. No. 50 ¶¶ 118–24.  Both of these claims are premised on the general assertion that these defendants sought to cover up that Valenzuela was injured and ultimately died due to excessive force by the five-man team.  *Id.* The Court dismisses these claims.

First, regarding the denial of access to courts claim, Cervantez asserts that the defendants impeded her "access to the courts by concealing information and falsifying their findings" regarding the cause of Valenzuela's injuries and by "denying request[s] for information."[25] *Id.* ¶¶ 120, 123.  There are two types of denial of access to courts claims: (1) "forward-looking claims alleging 'that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time'"; and (2) "backward-looking claims alleging that an official action has 'caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief.'"  *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019) (quoting *Christopher v. Harbury*, 536 U.S. 403, 413–14 (2002)).  Cervantez states she is bringing a forward-looking claim.  Dkt. No. 68 at 19.  But her claim does not resemble a typical forward-looking claim, which usually involve blockades to someone's ability to

---

[25] Cervantez, at times, discusses Valenzuela's right to access courts in discussing this claim.  Dkt. Nos. 50 ¶ 120; 68 at 19.  But there are no allegations anywhere in the complaint referencing any effort by Valenzuela to access a court or how his ability to do so was impacted.  *See generally* Dkt. No. 50.  Instead, the access to courts at issue here appears to be Cervantez's efforts to bring this litigation.

actually file their case in a court, such as filing fees imposed on indigent persons, not processing an inmate's mail to and from a court, or not allowing a prisoner to access a law library. *See Christopher*, 536 U.S. at 413; *Richardson v. McDonnell*, 841 F.2d 120, 122 (5th Cir. 1988). Cervantez has filed this case and has not demonstrated any barrier by a state actor to her proceeding further. And she has not cited to any cases where a court recognized a forward-looking claim based on government officials' failures to respond to information requests or to document injuries. *See* Dkt. Nos. 66 at 11–12; 68 at 11–14, 19; 78 at 22–24. Accordingly, she has failed to show the violation of a clearly established right, so the defendants are entitled to qualified immunity for her forward-looking denial of access to courts claim. *See Culberson*, 98 F.4th at 286–87.

Instead, to the extent such a claim can exist, courts consider them as backward-looking claims. But even if the Court were to construe her claim as a backward-looking claim, it still must be dismissed. Backward-looking claims have three elements: "(1) a nonfrivolous underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy that is not otherwise available in another suit that may yet be brought." *Waller*, 922 F.3d at 602 (quoting *United States v. McRae*, 702 F.3d 806, 830–31 (5th Cir. 2012)). The Court assumes for purposes of these motions that Cervantez has sufficiently alleged a nonfrivolous underlying excessive-force claim against the five-man team.

Nevertheless, her denial-of-access claim fails for two reasons. First, regarding Paxton, Love, and Peerwani, there are no factual allegations as to any actual investigations they personally undertook; all of Cervantez's allegations pertain to other members of their offices. *See* Dkt. No. 50 ¶¶ 30, 60–62. Thus, there is no basis to plausibly infer that they had any actual knowledge of Valenzuela's injuries such that they could have covered anything

up or that they took any actions connected to this alleged cover-up.  Without personal involvement or a causal connection between their conduct and the alleged harm, they cannot be liable.  *Evett*, 330 F.3d at 689.

Second, Cervantez has not cited to authority clearly establishing that failing to answer information requests or to document the cause of injuries violates an individual's right to access courts.  *See* Dkt. Nos. 66 at 9–12; 68 at 11–14, 19; 78 at 22–24.  Most of the cases she relies on involve prisoner mail.  *See* Dkt. Nos. 66 at 11–12; 68 at 11–14, 19.  She does cite *Waller*, where the plaintiff asserted a denial of access to courts claim where officials were alleged to have "sabotage[d] a crime scene and lie[d] to investigators" about whether the decedent was armed when he was shot.  922 F.3d at 602.  But there, the Fifth Circuit simply "assume[d]" that such a claim could constitute "an official act that frustrated the litigation of [a] claim" and ultimately dismissed the claim on other grounds.  *Id.* (quoting *McRae*, 702 F.3d at 830–31).  An appellate court merely assuming without deciding that sabotage might frustrate the litigation of a claim is insufficient to place the question of the constitutionality of an official's actions "beyond debate."  *See Batyukova*, 994 F.3d at 726 (quoting *al-Kidd*, 563 U.S. at 741); *Smith*, 507 F. App'x at 361.  Thus, Cervantez has failed to carry her burden to show that a clearly established right was violated as to any backward-looking claim.  Accordingly, the Court dismisses her denial of access to courts claim.

The defendants' qualified immunity as to the denial of access to courts claim also requires dismissal of the conspiracy claim.  To state a civil conspiracy claim under Section 1983, Cervantez must allege both an agreement between the defendants to commit an illegal act and an actual deprivation of constitutional rights.  *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994).  This second element requires proof of an independent constitutional

– 36 –

violation for which the defendants are not entitled to qualified immunity.  *Bevill v. Fletcher*, 26 F.4th 270, 275 (5th Cir. 2022).  So, because Cervantez's conspiracy claim is based on her denial of access to courts claim, *see* Dkt. No. 50 ¶¶ 118–24, her failure to overcome the defendants' qualified immunity as to the underlying claim is fatal to her conspiracy claim.

Moreover, there are simply no factual allegations that plausibly suggest any conspiracy by these defendants—in fact, besides Castillo and Boedeker, there is no basis to conclude that these defendants have ever even interacted with each other.  *See generally* Dkt. No. 50.  The only provided support for an alleged agreement between the defendants is that none of them documented excessive force as the cause of Valenzuela's injuries and death. *Id.* ¶¶ 60–62, 118–21.  Cervantez does not even allege that these defendants provided a unified story as to what happened to Valenzuela.  To the contrary, she claims that "their contradictory conclusions as to how [Valenzuela] died" shows an agreement.  *See* Dkt. No. 54 at 3.  The Court cannot plausibly infer from mere differing statements by these defendants that they formed an agreement to deprive Cervantez of her rights.  *See McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (noting that "'mere conclusory allegations of conspiracy cannot, absent reference to material facts,' state a substantial claim of federal conspiracy" (quoting *Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986)).  Thus, the civil conspiracy claim is dismissed.

### vi.    Deprivation of Familial Relationship

Finally, Cervantez asserts that unspecified defendants interfered with her right to a familial relationship with her son because of his wrongful death.  *See* Dkt. No. 50 ¶ 125.  To the extent she brings this claim against the defendants seeking dismissal, this claim is dismissed.

– 37 –

For one, while the Constitution's general protection of family relationships is "well-established,"[26] *Wooley v. City of Baton Rouge*, 211 F.3d 913, 920–21 (5th Cir. 2000), it does not appear that either the Supreme Court or the Fifth Circuit have recognized a deprivation of familial relationships claim in these circumstances—alleged wrongful death of an inmate due to excessive force and/or insufficient medical treatment, *see Arreola ex rel. Vallejo v. City of Fort Worth*, No. 4:17-CV-629-P, 2020 WL 3404120, at *7 (N.D. Tex. June 19, 2020). The cases cited by Cervantez involve widely different circumstances. *See* Dkt. No. 68 at 14–15.[27] The broad proposition of law that persons have rights to family relationships is insufficient to show that the right asserted here was clearly established. *See Bedingfield ex rel. Bedingfield v. Deen*, 487 F. App'x 219, 232–33 (5th Cir. 2012) (holding that a plaintiff's citation to a general constitutional right to communicate with family and friends was insufficient to clearly establish a prisoner's right to family visitation). Accordingly, the individual defendants are entitled to qualified immunity as to this claim.

---

[26] Notably this protection is established at least as it pertains to spouses and to minor children and their parents, neither of which are at issue here. *See Sinclair v. City of Seattle*, 61 F.4th 674, 679 (9th Cir. 2023) (noting that only the Ninth and Tenth Circuits have recognized a parent's "constitutional right to the companionship of her adult son"). No party addresses whether Valenzuela being an adult itself provides a basis for dismissal of this claim. *See* Dkt. Nos. 55 at 12; 68 at 14–16; 70 at 6.

[27] *City of Dallas v. Stanglin*, 490 U.S. 19 (1989) (holding that a city ordinance restricting certain dance halls to only teenagers did not violate the First Amendment); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (holding unconstitutional a state law prohibiting persons from marrying if they had a noncustodial minor child and were under an obligation to pay child support unless they first obtained court permission); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (holding that an organization's intimate-association rights were not violated by a state statute prohibiting discrimination based on protected categories, therefore requiring a male-only organization to include women); *Swanson v. City of Bruce*, 105 F. App'x 540, 542 (5th Cir. 2004) (finding no constitutionally protected relationship between two coworkers); *Kipps v. Caillier*, 205 F.3d 203, 205 (5th Cir. 2000) (noting that the case concerned adverse actions by government officials "because of [the plaintiff's] actual association with his son," which was "separate and distinct from a claim of state interference with that association").

Moreover, even if the Court followed the approach of the courts that have assumed that a decedent's relative could bring a deprivation-of-familial-relationships claim, Cervantez has not plausibly alleged such a claim. Those courts have required that the challenged state action be specifically "inten[ded] to interfere with a particular relationship protected by the freedom of intimate association." *E.g.*, *Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985); *Arreola*, 2020 WL 3404120, at \*7–8; *Molette v. City of Alexandria*, No. CV040501A, 2005 WL 2445432, at \*6 (W.D. La. Sept. 30, 2005).[28] There is no plausible basis for the Court to infer, based on the allegations here, that any of the officials' actions were taken for the specific purpose of interfering with Cervantez's relationship with Valenzuela. *See generally* Dkt. No. 50. Instead, she alleges that the five-man team beat Valenzuela because of his mental-health crisis and that the various documentation errors were made to cover up this excessive force. *Id.* ¶¶ 47–62. At best, Cervantez has only alleged that her relationship with her son was incidentally affected by the officials' conduct. This lack of direct intentionality is fatal to any deprivation of familial relationships claim. *E.g.*, *Arreola*, 2020 WL 3404120, at \*8. Accordingly, the Court dismisses this claim.

---

[28] *See also Ortiz v. Burgos*, 807 F.2d 6, 9 (1st Cir. 1986) (declining to recognize a claim based on the "incidental deprivation of the relationship between [the plaintiffs] and their adult relative" when that relative allegedly died due to excessive force by prison guards); *McCurdy v. Dodd*, 352 F.3d 820, 827–28 (3d Cir. 2003) ("[T]he Due Process Clause only protects against deliberate violations of a parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship."); *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005) (holding that there is no "constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action"). The only apparent exception is the Ninth Circuit, which notes that it is an "outlier" court that has "assumed that the right [to familial relationships] may be violated even when the relationship is not the target of state action." *Sinclair*, 61 F.4th at 679.

4.      **Conclusion**

In light of the foregoing, the Court grants the motions to dismiss (Dkt. Nos. 55; 56;

73).  While Cervantez's claims regarding the alleged excessive force inflicted by the five-

man team against Valenzuela are concerning, she has failed to state a claim to relief against

the movant defendants—none of whom was part of the five-man team.  Her excessive-force

claims against those five defendants will continue to be litigated in this case.  But each claim

against each defendant must stand on its own.  Plausible claims of unconstitutional conduct

by one group of government officials cannot impose liability against other officials loosely

related to the harm at issue without specific facts of violations by those officials.  In light of

Cervantez's failures to provide such factual allegations, the claims at issue in these motions

are not plausibly alleged and must be dismissed.

The Court further denies leave to amend.  First, Cervantez only requests leave to

amend her pleadings against Peerwani—not the other 11 defendants seeking dismissal—and

she does so without providing any explanation as to how she would cure the deficiencies

cited here.  *See* Dkt. No. 66 at 12; *see also* Dkt. Nos. 68.  Regarding Peerwani, Cervantez's

current complaint and Rule 7(a) reply both fail to allege any facts about actions taken or

policies promulgated by Peerwani.  *See generally* Dkt. Nos. 50; 54.  Accordingly, there is no

basis to conclude that Cervantez could ever state a claim against him.

As for the other defendants for whom Cervantez has not requested leave to amend,

she has already amended her complaint twice and had the opportunity to file a Rule 7(a)

reply to further outline her claims.  *See* Dkt. Nos. 5; 50; 54.  Nevertheless, she has still failed

to state a claim for relief.  There is no indication that a fifth opportunity to explain the

factual basis for her claims would lead to a different result.  And, as for the new re-

envisioning of the claims argued in the responses, these arguments are either irreconcilable with the factual allegations in the case thus far, inconsistent even in the responses themselves, or insufficient to overcome the problems highlighted here. Moreover, for several of the claims, Cervantez waived any challenge to the defendants' qualified immunity by failing to point to relevant similar authority clearly establishing the alleged violations. Cervantez is not pro se. She has had extensive opportunities to state her claims. And this case has already been pending in this Court for 19 months. It would be futile and cause undue delay and prejudice to allow another chance to replead these ever-shifting allegations. Accordingly, the Court dismisses with prejudice Cervantez's claims against Castillo, Boedeker, Peerwani, Valdez, Love, Paxton, Jumper, DeShields, Hefner, TDCJ, TBCJ, and TTUHSC.

      So ordered on June 12, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE